UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

-------------------------------------------------------

|  |  |  |
|---|---|---|
| | : | |
| WILLIE E. BANKS, | : | |
| | : | CASE NO. 11-CV-1759 |
| Plaintiff, | : | |
| | : | |
| v. | : | OPINION & ORDER |
| | : | [Resolving Doc. No. 11] |
| DENNIS CAMARILLO, *et al.*, | : | |
| | : | |
| Defendants. | : | |
| | : | |

-------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

Plaintiff Willie Banks filed this civil-rights lawsuit against the City of Lorain, Ohio, and Dennis Camarillo, a patrolman with the City of Lorain Police Department, alleging that Camarillo fabricated evidence that Banks possessed drugs and then arrested Banks without probable cause. Defendants move for summary judgment, *see* [Docs. 11, 15], and Banks opposes the motion, *see* [Doc. 14].  For the following reasons, the Court grants in part and denies in part Defendants' motion.

I.

The parties dispute nearly every fact material to the outcome of this case.  They do agree that this case arises from Defendant Camarillo's stop of Plaintiff Banks's vehicle on October 8, 2009, in Lorain, Ohio.  More particularly, the parties agree that Camarillo observed Banks drive his vehicle into the parking lot of the Lake Motel at around 9:30 p.m.  A few minutes later, Banks drove away

Case No. 1:11-CV-1759
Gwin, J.

from the motel.  Camarillo, who was driving an unmarked police car, followed Banks for some distance and then stopped him.  After a short discussion at the driver's-side window, Camarillo asked Banks for permission to search his car and Banks consented.  Shortly thereafter, Police Officer Camarillo, claiming that he had found cocaine on the front seat of Banks's car, arrested Banks for possessing cocaine and for speeding.  Six months later, a laboratory test confirmed that the "cocaine" Camarillo found, whatever it was, was not cocaine and was not a controlled substance.  [Doc. 14-6].

Whatever else happened is unclear—Banks swears one thing and Camarillo swears the opposite.  *Compare* [Doc. 14-1] *with* [Doc. 11-1].  If the jury believes Banks, then Camarillo violated Banks's rights, and grossly.  Conversely, if the jury believes Camarillo, then Banks's arrest was lawful.  The Court sets out the conflicting accounts in turn.

### Banks's Story

As Banks remembers it, he pulled into the Lake Motel to see if his friend "Rabbit" was interested in attending a birthday party.  [Doc. 14-1, at 2-3].  According to Banks, he had some reason to think that Rabbit was employed at one of the local motels.  *Id.* at 3.  Banks says he pulled into the Lake Motel's parking lot, "looked around for Rabbit, without getting out of [his] car, and [] honked [his] horn thinking that [Rabbit] might come out."  *Id.* at 4.  "No one approached [Banks's] car" and Banks left to see if Rabbit was at another motel.

At all times, Banks says, he operated his vehicle lawfully—he "looked both ways" at every stop sign, did not speed, and used turn signals where appropriate.  *Id.*  Nevertheless, after he had driven a short distance from the Lake Motel, Defendant Camarillo stopped him.  While stopping for Camarillo, Banks "never fidgeted, moved around, looked down, hid anything in, or under the seat, or otherwise moved in a furtive way at any time."  *Id.* at 6.  Camarillo walked up to Banks's door

-2-

Case No. 1:11-CV-1759
Gwin, J.

and asked Banks where he was coming from, observing that he "saw [Banks] leave that motel back

there." _Id._  Banks told Camarillo that he had been looking for "a friend to invite him to a birthday

party." _Id._  Camarillo responded, "I want to search this car," and Banks obliged.

Then, if Banks is telling the truth, he witnessed something remarkable and appalling:

Camarillo pulled a cocaine field-test strip from his pocket, leaned over the driver's seat and, with

a blue Sharpie marker he found in Banks's car, drew "a couple of spots on the paper." _Id._

(Apparently, these test strips, when mixed with the appropriate reagent, will turn blue in the presence

of cocaine.)  Camarillo then wheeled on Banks and falsely accused him of being a "crack head." _Id._

Banks's arrest followed.

### Camarillo's Story

Camarillo, of course, tells a very different tale.  Camarillo remembers watching Banks pull

into the Lake Motel, at which point he lost sight of Banks's vehicle.  [Doc. 11-1, at 2].  A few

minutes later, Camarillo saw Banks's vehicle leave the motel. _Id._  According to Camarillo, the Lake

Motel  is located "in an area in which prostitution and the sale of drugs takes place on a frequent

basis." _Id._  Indeed, that's why Camarillo was staking out the motel on October 8, 2009.  Banks's

short visit to the motel was, according to Camarillo's "training and experience as a police officer,"

"consistent with a street level drug transaction." _Id._  So when Banks drove away, Camarillo

"suspected that the occupant of the car had either obtained or delivered drugs at the Lake Motel."

_Id._  And Camarillo followed.

According to Camarillo, it took only a short time for Banks to commit two traffic violations.

First, Banks "switch[ed] from the curb lane to the center lane . . . without signaling [a] change of

course." _Id._ at 3.  Then he exceeded the 35-mile-per-hour speed limit by 14 miles per hour. _Id._

Case No. 1:11-CV-1759
Gwin, J.

Camarillo activated his lights and siren, and Banks stopped.  Through the rear window of Banks's car, Camarillo saw Banks "shift[] around in his seat and also look[] down and lean[] forward," which, "based upon [Camarillo's] experience," indicated that the "occupant was attempting to hide something, which is usually a handgun, drugs, open containers containing alcoholic beverages, or other thing[s] that may be illegal." *Id.* at 3.  Camarillo walked up to Banks's door and asked Banks "where he had been." *Id.* at 4.  Banks said that he had just stopped by the Lake Motel to see his friend, whom he identified by name as "Rabbit." *Id.*  According to Camarillo, "'Rabbit' is an alias of a known drug dealer in Lorain." *Id.*

Throughout the encounter, Camarillo says, Banks "appeared . . . to be nervous, and he was hesitant in making eye contact," *id.*, though Camarillo does not say whether his training and experience as a police officer teaches anything about this behavior.  In any event, Camarillo asked Banks for permission to search the car, and Banks obliged.  At this point, Camarillo noticed "several very small white crumbs on the dark driver's side seat that [he] believed, based upon [his] training and experience, were consistent with and looked like small crumbs of crack cocaine." *Id.*[1] According to Camarillo, when he tested the crumb with the cocaine field-test kit, the paper turned blue, "indicat[ing] the presumptive presence of cocaine." [Doc. 11-1, at 5].  Banks's arrest followed.

### The Aftermath

Banks explains, without much disagreement from Defendants, what happened next. Camarillo and other officers took Banks to the police station, where Banks complained that he was feeling ill.  [Doc. 14-1, at 8.]  When officers took Banks to a local medical center for treatment, his

---

[1] "Very small" indeed.  The "crumb" Camarillo sent to the lab was "less than one hundredths (<0.01) of a gram." [Doc. 14-6].

Case No. 1:11-CV-1759
Gwin, J.

illness apparently a ruse, Banks demanded to be administered a drug test.  *Id.*  The test showed no

controlled substances in Banks's urine.  [Doc. 14-4].  Meanwhile, after arresting Banks, Camarillo

inexplicably discarded the cocaine field-test paper he had used to test the "crumb" in Banks's car.

Camarillo never showed the field-test paper to anyone else, save perhaps Banks.  [Doc. 14-8, at

120:19-24].

　　　　At a preliminary hearing held on October 30, 2010, Camarillo testified consistent with his

story described above.  Banks's counsel cross-examined Camarillo as to his truthfulness, but Banks

did not testify and the magistrate bound the case over to a grand jury.  Later, the grand

jury—apparently relying exclusively on Camarillo's testimony, [Doc. 14-8, at 122-24]—indicted

Banks for possession of cocaine.

　　　　Then, in April 2010, the Lorain Country Crime Lab completed its analysis of the "crumb"

Camarillo found in Banks's car.  *See* [Doc. 14-6].  The result:  "No controlled substances found."

*Id.*  On July 27, 2010, an assistant prosecutor in Lorain signed a proposed order stipulating dismissal

of the charges against Banks and, two days after that, Lorain County Court of Common Pleas Judge

Betleski signed and entered the order.  [Doc. 14-7].

　　　　Exactly one year later, on July 29, 2011, Banks filed this lawsuit against Camarillo and the

City of Lorain, asserting claims against Camarillo (1) under 42 U.S.C. § 1983 for violations of his

Fourth Amendment rights; (2) for malicious prosecution in violation of Ohio law; and (3) for

intentional infliction of emotion distress in violation of Ohio law.[2/]  Banks also asserts a *Monell*

---

[2/]Defendants, observing the one-year statute of limitations in Ohio for malicious-prosecution and intentional-infliction-of-emotional-distress claims, argue that those two state-law claims are out of time because the prosecution indicated its intention to abandon the case on July 27, 2010.  But, as Banks correctly points out, in Ohio the court, not the prosecutor, dismisses criminal indictments.  *See State ex rel. Lotz v. Hover*, 174 Ohio St. 380, 381 (1963).

(continued...)

Case No. 1:11-CV-1759
Gwin, J.

claim against the City of Lorain.[3/]

Camarillo moves for summary judgment, arguing (1) that there is no genuine dispute that probable cause supported Banks's arrest and (2) that even if Banks's arrest was not supported by probable cause, Camarillo is entitled to qualified immunity on Banks's § 1983 claim.  Furthermore, Camarillo argues, he is entitled to state-law immunity on Banks's state-law claims.  *See* Ohio Rev. Code § 2744.03(A)(6).

## II.

At the outset, the Court finds that Banks has insufficient evidence to support a *Monell* claim against the City of Lorain.  "Before a local government can be held liable for injuries under section 1983, . . . a plaintiff must show that his injuries were the result of some 'policy or custom' attributable to the governmental entity." *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1245 (6th Cir. 1989) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)).  Banks all but concedes that he has no evidence that a City of Lorain policy or custom was the "moving force," *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978), behind his claimed constitutional injuries, complaining that he "has not had sufficient time to conduct discovery against the City [to] ascertain whether his *Monell* claim can withstand summary judgment," [Doc. 14, at 49], and promising that he "will separately file[] a motion requesting an additional 45 days to conduct discovery on the *Monell* claim, [Doc. 14, at 50].  Banks has not filed such a motion, however, and the Court sees no good reason to extend the now-passed discovery deadline.  Accordingly, there being no evidence of a City of Lorain

---

[2/](...continued)
That happened on July 29, 2010, exactly one year before Banks filed this lawsuit.

[3/]Banks had also asserted a claim against Camarillo for abuse of process, but has abandoned it.  *See* [Doc. 14, at 2 n.1].

-6-

Case No. 1:11-CV-1759
Gwin, J.

policy or custom behind Banks's claimed constitutional injuries, the Court grants summary judgment to the City of Lorain.

Remaining, then, are Banks's § 1983 and state-law claims against Camarillo. The Court addresses each in turn.

### Banks's § 1983 Claim

Banks asserts that his arrest violated the Fourth Amendment because it was not supported by probable cause. If he is correct, then § 1983 provides a remedy for this violation.

Before turning to the substance of Banks's § 1983 claim, the Court must first consider whether Camarillo is correct that Banks is precluded from litigating the existence of probable cause in this case. Camarillo argues that the existence of probable cause was conclusively determined (1) at the October 30, 2010, preliminary hearing in Banks's criminal case and (2) by the grand jury when it decided to indict Banks. The Court concludes that neither bars Banks's claim.

First, though Banks did in one way contest the issue of probable cause at his October 30, 2010, preliminary hearing, Defendants did not assert the affirmative defense of collateral estoppel in their answer, *see* [Doc. 3], and thus have waived it, *see Blonder-Tongue Laboratories, Inc. v. Uniiv. of Ill. Found.*, 402 U.S. 313, 350 (1971). Moreover, even though Banks may have had a "full and fair opportunity" to contest probable cause at that preliminary hearing, he did not take full advantage; he did not testify. *Coogan v. City of Wixom*, 820 F.2d 170, 175 (6th Cir. 1987) ("We do not hold that every determination in a preliminary hearing should be given preclusive effect in a subsequent § 1983 action. . . . [E]ven when an opportunity for full adversary proceedings is afforded, strategic concerns may counsel against engaging in such an exercise at the early stages of a criminal proceeding.").

-7-

Case No. 1:11-CV-1759
Gwin, J.

Furthermore, the usual presumption of probable cause attaching to a grand-jury indictment can be rebutted when, as here, a § 1983 plaintiff has evidence that the indictment "was secured through bad faith or perjury." *McClellan v. Smith*, 439 F.3d 137, 146 (2d Cir. 2006). Camarillo acknowledges that his grand-jury testimony—including his testimony that he properly field-tested the crumbs he found in Banks's car—was the principal, perhaps only, evidence offered to the grand jury. [Doc. 14-8, at 122-24]. Accordingly, if that testimony was false, as Banks's claims it was, then Banks can properly rebut the presumption of probable cause arising from his indictment and assert his § 1983 claim in this case.

The Court turns, then, to the substance of Banks's § 1983 claim. The Fourth Amendment prohibits "unreasonable" seizures. Generally, an arrest is "unreasonable" if it is not supported by probable cause. *Herring v. United States*, 555 U.S. 135, 136 (2009). Camarillo points to a litany of facts that, he says, provided probable cause to believe that Banks's was in possession of cocaine. *See* [Doc. 11, at 8-12]. Accordingly, Camarillo argues, Banks cannot succeed on his § 1983 claim.

Camarillo forgets that at this stage the Court is bound to resolve genuine factual disputes in Banks's favor and also to draw any reasonable inferences from those facts in Banks's favor. *See Jones v. Potter*, 488 F.3d 397, 402-03 (6th Cir. 2007) ("In considering a motion for summary judgment, the district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party."). And most of the facts Camarillo identifies as establishing probable cause are genuinely disputed. *See, e.g.*, [Doc. 11, at 11 ("Mr. Camarillo saw the Plaintiff . . . shift around in his seat and look down and lean forward . . . ."), and at 12 ("Mr. Camarillo could, and did, perform a field test . . . to determine whether the substance tested positive for crack cocaine. Mr. Camarillo interpreted the test result . . . as positive for the presence of cocaine . . . .")]. After setting aside the

-8-

Case No. 1:11-CV-1759
Gwin, J.

genuinely disputed facts on which Camarillo attempts to rely, the Court is left with only two potentially suspicious facts that, on their own, are woefully insufficient to support probable cause. First, everyone agrees that Banks pulled into the Lake Motel's parking lot, which is located "in an area in which prostitution and the sale of drugs takes place on a frequent basis," [Doc 11-1, at 2], and stayed for only a few minutes. Second, Banks does not seriously dispute that Camarillo at some point observed "several very small white crumbs on the dark driver's side seat" of Banks's car. *Id.* at 4.

Camarillo has additionally asserted that he "believed, based upon [his] training and experience," that the crumbs were likely "crack cocaine." *Id.* But, and this is critical, Banks has evidence that the crumbs did not look like crack cocaine, but instead looked like one of "about a million other possibilities." [Doc. 14-8, at 162:19-163:6 (Camarillo's Deposition)]. In particular, Banks has evidence (albeit his own testimony) that Camarillo did not make any effort to test the crumbs properly but instead proceeded to generate a falsely positive field test. If Banks is telling the truth, then this fact completely undermines Camarillo's assertion that the crumbs looked like crack cocaine. After all, if Camarillo had any reason to believe that he was looking at crack cocaine, he would have had no reason to substitute a proper field test for a foolish, probably career-ending falsification. For this reason, whether the crumbs Camarillo found in Banks's vehicle appeared to be crack cocaine is a genuinely disputed fact.

It probably goes without saying that an officer lacks probable cause to arrest a suspect for cocaine possession when the officer observes a substance in a suspect's vehicle but the substance does not, in the officer's training and experience, appear to be cocaine. *See Michigan v. DeFillippo, 443 U.S. 31, 37 (1979)* ("This Court repeatedly has explained that 'probable cause' to justify an

-9-

Case No. 1:11-CV-1759
Gwin, J.

arrest means *facts and circumstances within the officer's knowledge* that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." (emphasis added)). Camarillo does not disagree, nor does he argue that a reasonable police officer could mistakenly conclude that probable cause exists in those circumstances, *see Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987). Indeed, Camarillo gives abbreviated shrift to his claim of qualified immunity, *see* [Doc. 11, at 18-19], instead devoting his time to laughing off Banks's story as fabricated, "incredible[,] and not credible." [Doc. 15, at 2-3]. But that argument is properly made to the jury at trial, not to the Court at summary judgment.

Moreover, Banks's testimony is somewhat supported by other evidence, specifically, that Camarillo discarded the filed test without showing it to anyone else, that Banks's urine tested negative for the presence of cocaine, and that, in the final analysis, the crumbs were determined not to be crack cocaine. In any event, if Banks is lying, then it is for the jury to say so, not the Court.

Accordingly, summary judgment on this claim is not appropriate.

### Banks's Claim for Malicious Prosecution in Violation of Ohio Law

"The essential elements of a malicious criminal prosecution [under Ohio law] are (1) malice in instituting or continuing the prosecution, (2) lack of probable cause, and (3) termination of the prosecution in favor of the criminal defendant." *Trussell v. General Motors Corp.*, 53 Ohio St. 3d 142, 144 (1990).

Camarillo argues that Banks cannot establish that Camarillo acted with "malice," *i.e.*, "an improper purpose, or any purpose other than the legitimate interest of bringing an offender to justice." *Criss v. Springfield Twp.*, 56 Ohio St. 3d 82 (1990) (defining "malice" for "purposes of

-10-

Case No. 1:11-CV-1759
Gwin, J.

malicious prosecution" as "an improper purpose, or any purpose other than the legitimate interest of bringing an offender to justice."). But of course Banks can, if the jury believes Banks's story that Camarillo manufactured evidence in order to obtain probable cause. *See id.* ("If the basis for prosecution cannot be shown, those who made the decision will appear to have acted with no basis—that is, maliciously."). Furthermore, as explained above, if the jury believes Banks's account, then it can properly find that the arrest was not supported by probable cause. Finally, and contrary to Camarillo's argument, Banks's criminal prosecution terminated in Banks's favor. Even though the cocaine-possession charge was dismissed "without prejudice," Ohio has, for more than a hundred years, permitted claims for malicious prosecution in these circumstances. *See Douglas v. Allen*, 56 Ohio St. 156, 159-60 (1897) ("[I]t would seem that the reason of the rule requiring the termination of the prosecution before the commencement of the action is as well satisfied where it is ended by a nolle prosequi, followed by the discharge of the accused, as it is by his acquittal of the charge. The prosecution being so ended, there can thereafter be no conviction of the accused in that proceeding, and therefore no opportunity to establish in that proceeding the existence of probable cause for the prosecution. True, a nolle may be entered at a time where it will not preclude another prosecution for the same offense, but the institution of another prosecution requires a new complaint or indictment, and becomes a new proceeding.") (cited with approval in *Ash v. Ash*, 72 Ohio St. 3d 520, 522 (1995) ("[A]n unconditional, unilateral dismissal of criminal charges *or an abandonment of a prosecution by the prosecutor* . . . that results in the discharge of the accused generally constitutes a termination in favor of the accused." (emphasis added))).

Moreover, if Camarillo acted with malice, then he is not eligible for the immunity Ohio Revised Code § 2744.03 normally provides. Ohio Rev. Code § 2744.03(A)(6)(b) ("[T]he employee

-11-

Case No. 1:11-CV-1759
Gwin, J.

[of a political subdivision] is immune from liability unless . . . [t]he employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner.").[4/]

Accordingly, summary judgment on this claim is inappropriate.

**Banks's Claim for Intentional Infliction of Emotional Distress in Violation of Ohio Law**

In Ohio, "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress . . . ." *Yeager v. Local Union 20*, 6 Ohio St. 3d 369, 374 (1983).

Camarillo makes two conclusory arguments with respect to Banks's claim for intentional infliction of emotional distress. First, Camarillo asserts that there is insufficient evidence that his conduct was "extreme and outrageous," pointing out that "[l]iability has only been found where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 375. Camarillo's point suffers, however, from his continuing failure to acknowledge that at summary judgment the Court must view the facts in the light most favorable to Banks, resolving genuine factual disputes in Banks's favor. As explained above, Banks offers evidence that Camarillo intentionally fabricated evidence of a criminal drug offense and then arrested Banks for that offense. That is hardly on par with "mere insults, indignities, threats, annoyances, petty oppressions, [and] other trivialities." *Id.* If the jury finds that Banks is telling the truth and Camarillo is not, as the Court must assume it will, then the jury, *i.e.*, "average member[s] of the community," may properly harbor "resentment against the actor, and . . . exclaim, 'Outrageous!'" *Id.*

Second, Camarillo asserts—in a two-sentence argument, [Doc. 11, at 15]—that there is

_____

[4/]For this reason, the Court also cannot conclude as a matter of law that Camarillo is entitled to state-law immunity on Banks's intentional-infliction-of-emotional-distress claim.

Case No. 1:11-CV-1759
Gwin, J.

insufficient evidence that the emotional distress Banks claims to have suffered was such that "a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case." *Paugh v. Hanks*, 6 Ohio St. 3d 72, 78 (1983). But Camarillo points to no legal rule in Ohio that an intentionally false arrest followed by an overnight stay in jail and an indictment cannot, as a matter of law, cause "severe emotional distress." And Banks, for his part, claims that the ordeal caused him "great emotional distress which [he] found nearly unbearable." [Doc. 14-1, at 10]. In the end, such matters are, as here, "usually . . . jury question[s]." *Paugh*, 6 Ohio St. 3d at 80.

Accordingly, summary judgment on this claim is inappropriate.

III.

For these reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion for summary judgment, [Doc. 11].

IT IS SO ORDERED.

Dated: April 16, 2012                                      s/          *James S. Gwin*
                                                          JAMES S. GWIN
                                                          UNITED STATES DISTRICT JUDGE

-13-